No. 20-56180

# In the United States Court of Appeals for the Ninth Circuit

---

**KATHRYN SPLETSTOSER,**

*Plaintiff-Appellee,*

v.

**JOHN E. HYTEN, *as an individual*; UNITED STATES OF AMERICA**

*Defendants-Appellants.*

---

On Appeal from the United States District Court for the
Central District of California (No. 2:19-cv-10076) (Fitzgerald, J.)

---

## APPELLANT JOHN E. HYTEN'S PETITION FOR REHEARING AND REHEARING EN BANC

---

LISA S. BLATT
AMY MASON SAHARIA
KARI M. LORENTSON
ROHIT ASIRVATHAM
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
(202) 434-5000
lblatt@wc.com

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................1

STATEMENT .......................................................................2

ARGUMENT ........................................................................7

    I.    The Panel's Decision Conflicts with Supreme Court Precedent and Decisions of Other Circuits........................................8

    II.   The Panel's Decision Highlights the Irreconcilable Condition of the Ninth Circuit's *Feres* Jurisprudence ...................15

    III.  The Question Presented Is Exceptionally Important ..................19

CONCLUSION....................................................................21

# TABLE OF AUTHORITIES

Page

Cases:

*Aikens v. Ingram*, 811 F.3d 643 (4th Cir. 2016)................................14

*Becker v. Pena*, 1997 WL 90570 (9th Cir. Feb. 28, 1997) .....................15, 19

*Borden v. Veterans Admin.*, 41 F.3d 763 (1st Cir. 1994) ..............................12

*Brooks v. United States*, 337 U.S. 49 (1949) ................................................10

*Citizens Nat'l Bank of Waukegan v. United States*,
    594 F.2d 1154 (7th Cir. 1979) ............................................................14, 15, 20

*Corey v. United States*, 1997 WL 474521 (10th Cir. Aug. 20, 1997)............13

*Feres v. United States*, 340 U.S. 135 (1950)........................................*passim*

*Filer v. Donley*, 690 F.3d 643 (5th Cir. 2012) ................................................14

*Harten v. Coons*, 502 F.2d 1363 (10th Cir. 1974) ..........................................12

*Jackson v. Brigle*, 17 F.3d 280 (9th Cir. 1994)..........................................8, 15

*Johnson v. United States*, 704 F.2d 1431 (9th Cir. 1983)..............6, 10, 17, 18

*Kitowski v. United States*, 931 F.2d 1526 (11th Cir. 1991) ...............11, 12, 14

*Lutz v. Sec'y of the Air Force*, 944 F.2d 1477 (9th Cir. 1991) .......................16

*Mackey v. Milam*, 154 F.3d 648 (6th Cir. 1998)............................................13

*Mackey v. United States*, 226 F.3d 773 (6th Cir. 2000)..................................13

*Morris v. Thompson*, 852 F.3d 416 (5th Cir. 2017)...................................11, 14

*O'Neil v. United States*, 202 F.2d 366 (D.C. Cir. 1953) .................................12

*Parker v. United States*, 611 F.2d 1007 (5th Cir. 1980) ................................11

*Persons v. United States*, 925 F.2d 292 (9th Cir. 1991)...................................8

*Pierce v. United States*, 813 F.2d 349 (11th Cir. 1987)..................................11

*Richards v. United States*, 176 F.3d 652 (3d Cir. 1999) ................................12

*Schoenfeld v. Quamme*, 492 F.3d 1016 (9th Cir. 2007).........................2, 8, 15

*Stauber v. Cline*, 837 F.2d 395 (9th Cir. 1988).......................................17, 19

*Stewart v. United States*, 90 F.3d 102 (4th Cir. 1996) ...................................12

*Stubbs v. United States*, 744 F.2d 58 (8th Cir. 1984) .....................................13

*United States v. Carroll*, 369 F.2d 618 (8th Cir. 1966) ..................................12

*United States v. Johnson*, 481 U.S. 681 (1987)..............................................10

*United States v. Shearer*, 473 U.S. 52 (1985)...................................1, 17, 20

*Wake v. United States*, 89 F.3d 53 (2d Cir. 1996) .........................................12

*Walls v. United States*, 832 F.2d 93 (7th Cir. 1987).......................................12

*Woodside v. United States*, 606 F.2d 134 (6th Cir. 1979)...............................12

Page

Statute:

    Westfall Act, 28 U.S.C. § 2679........................................................................4, 5

Other Authority:

    Statement of Dr. Heather Wilson, Former Secretary of the Air
        Force (July 30, 2019), https://bit.ly/3DvyTqB.............................................3

## INTRODUCTION

The *Feres* doctrine bars suits by military servicemembers for "injuries [that] arise out of or are in the course of activity incident to service." *Feres v. United States*, 340 U.S. 135, 146 (1950). This case presents a question of exceptional and recurring importance: in determining whether a claim is barred by the doctrine's "activity incident to service" test, must courts look to the *defendant's* alleged tortious conduct, rather than the "activity" the *injured servicemember* was engaged in? In conflict with Supreme Court precedent and precedent from other circuits, a panel of this Circuit erroneously focused on the alleged tort, rather than the plaintiff's activity.

The panel's outlier focus-on-the-tort approach undermines the core purpose of the *Feres* doctrine: preventing civilian courts from "second-guess[ing] military decisions" and "impair[ing] essential military discipline." *United States v. Shearer*, 473 U.S. 52, 57 (1985). Plaintiff's claims against her military supervisor—General John Hyten, the former Vice Chairman of the Joint Chiefs of Staff—would require a civilian court to redo an exhaustive military investigation that cleared General Hyten of wrongdoing. The *Feres* doctrine forecloses that result. Rehearing is necessary to correct the panel's error and bring this Circuit's caselaw—which this Court has described as "something of

1

a muddle," *Schoenfeld v. Quamme*, 492 F.3d 1016, 1019 (9th Cir. 2007)—in line with Supreme Court precedent and other circuits' caselaw.

## STATEMENT

1. <u>Factual background.</u>  Defendant-appellant General John Hyten served as Commander of the United States Strategic Command ("STRAT-COM") from November 2016 through September 2019.  First Am. Compl. ("FAC") ¶ 10, ER-33-34 (Dkt. 17).  STRATCOM is a combatant command that aims to "deter strategic attack and employ forces, as directed, to guarantee the security of our nation and our allies."  FAC ¶¶ 24-25, ER-35.  During General Hyten's tenure as STRATCOM Commander, plaintiff-appellee Colonel Spletstoser served as his subordinate as Director of the Commander's Action Group.  FAC ¶¶ 18, 20, ER-34.  Colonel Spletstoser was relieved of that position in February 2018 following a formal investigation into complaints from STRATCOM employees that she displayed "toxic leadership."  Compl. ¶¶ 53-58, 73-74, ER-94, 97-98.

More than a year later, in April 2019, the President nominated General Hyten to serve as Vice Chairman of the Joint Chiefs of Staff.  Compl. ¶ 80, ER-98.  Days later, Colonel Spletstoser reported allegations of sexual assault against General Hyten to the Air Force Office of Special Investigations.

Compl. ¶ 81, ER-98. General Hyten denied those allegations. Following a three-month-long investigation, in which investigators interviewed 63 people and reviewed 196,000 e-mails, 4,000 pages of documents, and 152 travel records, the General Court-Martial Convening Authority concluded in a 1,400-page report that the evidence provided no basis for disciplinary action against General Hyten. Compl. ¶¶ 113, 117-19, ER-102-03; Statement of Dr. Heather Wilson, Former Secretary of the Air Force (July 30, 2019), https://bit.ly/3DvyTqB.

The Senate also exhaustively investigated the allegations. It received over 15 hours of testimony, including from Colonel Spletstoser, reviewed over 1,000 pages of records, and examined statements from more than 50 witnesses. The Senate confirmed General Hyten by a 75-22 vote, and he served as Vice Chairman until retiring in 2021. Appellants' Br. 4-5 (Dkt. 16).

2. <u>Original complaint.</u> In November 2019, Colonel Spletstoser sued. Her complaint alleged that General Hyten—Colonel Spletstoser's "first-line supervisor," Compl. ¶ 2, ER-85—sexually harassed and assaulted her on numerous occasions from January through December 2017, while the two were at STRATCOM's offices or traveling for STRATCOM-related assignments. Compl. ¶ 2, ER-85. Colonel Spletstoser also alleged that the Department of

3

Defense mishandled the investigation and wrongly declined to impose disciplinary action. Compl. ¶ 124, ER-104.

Colonel Spletstoser alleged that in December 2017, while she and General Hyten were attending the Reagan National Defense Forum in Simi Valley, California, General Hyten came to her hotel room in the evening as she was preparing for bed, "under the pretense of work-related purposes," and sexually assaulted her. Compl. ¶ 45, ER 91-92. Colonel Spletstoser later submitted a declaration confirming the military purpose of the Simi Valley trip. *See* Decl. ¶¶ 57-66, ER-67-71. For example, the Secretary of Defense determined the number of military personnel to attend the Forum, and the official agenda focused on defense-related topics. Decl. ¶¶ 60, 66, ER-68-71.

The complaint asserted common-law and statutory claims against General Hyten in his individual capacity. Compl. ¶¶ 140-223, ER-106-115. The Department of Justice certified that General Hyten was acting within the scope of his office or employment at the time of the alleged incidents and gave notice substituting the United States as defendant under the Westfall Act. Notice, ER-76-77 (citing 28 U.S.C. § 2679(d)(1)).

4

The United States moved to dismiss the complaint under the *Feres* doctrine. The district court granted that motion with leave to amend after concluding that certain allegations—including General Hyten's superiority in rank over Colonel Spletstoser and the suit's relationship to military discipline—counseled in favor of applying *Feres*. Order at 2-4, ER-53-55.

3.    Amended Complaint.    In Colonel Spletstoser's amended complaint, she substantially narrowed the scope of her allegations to focus exclusively on the alleged incident at the Forum. *See* FAC ¶¶ 30-75, ER-35-41. Colonel Spletstoser omitted from the amended complaint previous allegations that General Hyten had come to her hotel room "under the pretense of work-related purposes," that General Hyten was her "first-line supervisor," and that the government "failed to conduct a fair investigation into [his] conduct." *Compare* Compl. ¶¶ 2, 36, 45, ER-85-98, *with* FAC, ER-32-49.

The United States again moved to dismiss under *Feres*, but this time the district court denied the motion. Order at 1, ER-3. The court also denied the United States' motion to dismiss under the Federal Tort Claims Act's intentional torts exception, holding that the narrowed allegations overcame the presumption that General Hyten was acting within the scope of his employment for purposes of the Westfall Act. Order at 26-27, ER-28-29. The court also

denied the United States' motion to transfer venue to the District of Nebraska—where STRATCOM is headquartered and where General Hyten and Colonel Spletstoser were stationed in 2017. Order at 2, ER-4; *see* Compl. ¶¶ 41, 43, ER-91. The United States and General Hyten appealed.

4. <u>Panel Opinion.</u> A panel of this Court affirmed, holding that "the alleged sexual assault … was not … 'incident to service.'" Add.39. At the outset, the panel explained that the "allegation of sexual assault … will, as it should, weigh heavily in our analysis." Add.30-31. To perform its "ultimate task" of determining whether the claimed injury arose out of an "activity incident to service," the panel considered the four factors articulated in *Johnson v. United States*, 704 F.2d 1431, 1436-39 (9th Cir. 1983). Add.18, 30-41.

Applying the first *Johnson* factor—the location of the alleged tortious act—the panel concluded that the hotel's off-base location weighed against application of the *Feres* doctrine. Add.31.

Analyzing the second factor—duty status when the alleged tortious act occurred—the panel acknowledged that Colonel Spletstoser was on active-duty status, but found it important that she alleged that she was preparing for bed and that General Hyten was wearing workout clothes at the time. Add.33.

As to the third factor—benefits accruing to the servicemember due to her military status—the panel highlighted that the alleged incident occurred at an off-base hotel open to the public, even though both parties were at the hotel to attend the Forum on the military's behalf.  Add.31, 36.

Turning to the fourth factor—nature of the activities when the alleged tortious act occurred—the panel focused on the alleged assault.  It reasoned that "one would be hard-pressed to conclude that a tortious sexual assault is in any way incident to a 'decision requiring military expertise or judgment,'" and that it would be a "highly unusual circumstance when a sexual assault" would further a "military purpose."  Add.38-39.

"After analyzing the factors … and considering the totality of the circumstances," the panel answered the outcome-determinative "incident to service" question:  it concluded that the "act of alleged sexual assault was not incident to military service."  Add.39-40.

## ARGUMENT

The *Feres* doctrine "immunize[s] the United States and members of the military from any suit which may require a civilian court to 'intrude in military affairs,' 'second-guess[ ] military decisions,' or 'impair[ ] military discipline.'"

*Jackson v. Brigle*, 17 F.3d 280, 282 (9th Cir. 1994) (alterations in original) (citation omitted).  The doctrine encompasses "'*all* injuries suffered by military personnel that are even remotely related to the individual's *status* as a member of the military.'"  *Persons v. United States*, 925 F.2d 292, 296 n.7 (9th Cir. 1991) (citation omitted).

The panel's decision allowing this suit to proceed cries out for rehearing.  First, the decision conflicts with Supreme Court precedent and decisions of other circuits.  Second, it adds to the disorder of this Circuit's "irreconcilable" and "muddle[d]" *Feres* caselaw.  *Schoenfeld*, 492 F.3d at 1019.  And third, it opens the door to second-guessing military decisions and burdening military personnel with the demands of litigation.  The Court should grant rehearing.

## I.  The Panel's Decision Conflicts with Supreme Court Precedent and Decisions of Other Circuits

*Feres* bars suits by servicemembers for "injuries [that] arise out of or are in the course of activity incident to service."  *Feres*, 340 U.S. at 146.  The panel's approach flips that rule on its head by focusing the inquiry on whether the *defendant's* alleged tortious conduct, rather than the "activity" the *injured servicemember* was engaged in, was "incident to service."  If the decision is

allowed to stand, the military would face the prospect of second-guessed decisions and disruptive discovery based on the happenstance of whether a plaintiff could sue in this Circuit.

1.      Under *Feres*, the panel should have framed the inquiry as whether Colonel Spletstoser's activity at the time of her alleged injury—meeting with her military superior for "work-related purposes," Add.33; Compl. ¶ 45, ER-92—was incident to her service.  To ask that question is to answer it.  She was an on-duty colonel meeting with a general, her military superior, for the purpose of work while representing the military at a national defense forum.  There should be no question that *her* activity was "incident to service."

But the panel did not focus on her activity.  Instead, the panel held that "the alleged *sexual assault* … was not … 'incident to service.'"  Add.39 (emphasis added) (citation omitted).  This rewriting of *Feres* to hinge on the nature of the alleged tortious act, rather than the injured servicemember's "activity," shaped the panel's entire analysis.  It is why the panel stated at the outset that the "allegation of sexual assault … will, as it should, weigh heavily in our analysis."  Add.30-31.  And it is what drove the panel's sweeping declaration that

"it would be a highly unusual circumstance when a sexual assault" would "further any conceivable military purpose, and thus be considered incident to military service." Add.39.

2.   This tort-focused approach to the *Feres* doctrine contravenes Supreme Court precedent.  Start with *Feres* itself, where the Court barred a negligence suit arising out of Feres's death while on duty in his barracks.  340 U.S. at 146.  Just the previous year, the Court in *Brooks v. United States*, 337 U.S. 49 (1949), had allowed a servicemember suit to proceed.  *Feres* explained that the "vital distinction" lies in the servicemembers' activities at the time of the incidents:  unlike Feres, "Brooks was on furlough, driving along the highway, under the compulsion of no orders or duty and on no military mission." 340 U.S. at 146.

*United States v. Johnson*, 481 U.S. 681 (1987), too, illustrates the panel's fundamental error.  In *Johnson*, a servicemember died in a helicopter crash while on a military mission.  *Id.* at 682-83.  His wife sued, alleging that the civilian flight controllers' negligent radar control caused her husband's death. *Id.* at 683.  In holding that *Feres* barred the claim, the Court considered the deceased servicemember's activity at the time of the incident—"performing a rescue mission on the high seas"—as the relevant "activity."  *Id.* at 691-92.

10

3.     Absent further review, the panel's approach would create a circuit split.  Other circuits treat the injured servicemember's activity at the time of injury as the relevant "activity" that must be "incident to service."  Take the Fifth Circuit, which focuses on whether the injured servicemember "was engaged in activities incident to his military service at the time of his" injury. *Parker v. United States*, 611 F.2d 1007, 1009 (5th Cir. 1980); *see also Morris v. Thompson*, 852 F.3d 416, 421 (5th Cir. 2017) (explaining that the test looks at "the activity in which the service member was engaged at the time of the injury").

Or the Eleventh Circuit, which asks whether "the injured service member was engaged in activity incident to service."  *Pierce v. United States*, 813 F.2d 349, 353 (11th Cir. 1987) (per curiam) (citation omitted).  The Eleventh Circuit thus held that *Feres* barred a suit alleging that military instructors held a servicemember under water, while "other recruits were commanded to line up, turn their backs and sing the national anthem" until he died.  *Kitowski v. United States*, 931 F.2d 1526, 1528 (11th Cir. 1991).  The court did not ask whether the *intentional drowning* was incident to service; it obviously was not.  Instead, the court focused on the servicemember and the "activity [he]

11

was engaged in at the time of the injury"—"participating in training exercises." *Id.* at 1529. The list goes on.[1]

The panel's contrary approach will lead to anomalous results. The panel explained that under its tort-focused approach, "it would be a highly unusual circumstance when a sexual assault … would … be considered incident to military service." Add.39. But other circuits apply *Feres* to bar similar suits. For example, the Sixth Circuit applied *Feres* to bar an intentional tort suit based

---

[1] *See, e.g.*, *Borden v. Veterans Admin.*, 41 F.3d 763, 763-64 (1st Cir. 1994) (per curiam) ("a straightforward application of the 'incident to service' test … depends on the plaintiff's military status in relation to" the tortious activity, and focusing on plaintiff's activity—getting "medical treatment at a military hospital"—not the fact that the care "was rendered in part by civilian employees"); *Wake v. United States*, 89 F.3d 53, 61 (2d Cir. 1996) (focusing on plaintiff's activities); *Richards v. United States*, 176 F.3d 652, 656 (3d Cir. 1999) (focusing on servicemember's "activity at the time of the accident"); *Stewart v. United States*, 90 F.3d 102, 105 (4th Cir. 1996) (focusing on activity the injured servicemember "was engaged in"); *Woodside v. United States*, 606 F.2d 134, 141 (6th Cir. 1979) ("*Feres* requires that there be some proximate relationship between the [injured] service member's activity and the Armed Forces."); *Walls v. United States*, 832 F.2d 93, 95 (7th Cir. 1987) (inquiry "turns on whether Walls was acting incident to military service when the Aero Club plane crashed"); *United States v. Carroll*, 369 F.2d 618, 623 (8th Cir. 1966) (barring injured servicemember's claim "because at the time he was injured he was engaged in 'activity incident to (military) service'"); *Harten v. Coons*, 502 F.2d 1363, 1365 (10th Cir. 1974) ("Whether a serviceman's injury arises out of activity 'incident to service' depends on … the claimant's 'status' at the time of the injury."); *O'Neil v. United States*, 202 F.2d 366, 367 (D.C. Cir. 1953) (focusing on injured servicemember's activity—seeking out "treatment for his allergy in a government hospital"—and not the naval hospital's tortious administration of an overdose of epinephrine).

on sexual misconduct. *See Mackey v. Milam*, 154 F.3d 648, 652 (6th Cir. 1998); *Mackey v. United States*, 226 F.3d 773, 776 (6th Cir. 2000); *see also Corey v. United States*, 1997 WL 474521, at *4-5 (10th Cir. Aug. 20, 1997) (applying *Feres* to bar sexual misconduct claims, including ones arising from sexual assault at a party).

The Eighth Circuit's decision in *Stubbs v. United States*, 744 F.2d 58 (8th Cir. 1984) (per curiam), is particularly on point. There, the servicemember was ordered "to the latrine for what she thought was" cleaning duty, but was instead sexually harassed. *Id.* at 59. The Eighth Circuit held, in conflict with this panel, that although "the *sexual harassment* certainly served no military purpose," the "relationship between *Stubbs' activity* at the time of the incident and her military service" required applying *Feres*. *Id.* at 60 (emphasis added).

Absent further review, the effects of the panel's divergent approach would sweep beyond sexual misconduct cases. Intentional tort suits arising from Camp Pendleton in California will receive different treatment than those arising from Fort Hood in Texas. That is because under the panel's approach, this Circuit must focus on the alleged tort itself and ask whether *it* was incident to service. Intentional torts often will fail to further a "military purpose and thus [would not] be considered incident to military service." Add.39.

13

Other circuits, in contrast, rightly understand that it is "not the nature of the claim[] that is controlling." *Filer v. Donley*, 690 F.3d 643, 650 (5th Cir. 2012). Indeed, the Eleventh and Fourth Circuits have held that there is no "exception to *Feres* where egregious conduct causes an injury." *Kitowski*, 931 F.2d at 1529; *see Aikens v. Ingram*, 811 F.3d 643, 651 (4th Cir. 2016).

This difference in approach is dispositive here and can create diametrically divergent results based on the arbitrary happenstance of where the plaintiff sues. Take, for example, the facts in the Fifth Circuit's decision in *Morris*: it is hard to see the military purpose behind one intoxicated servicemember "chok[ing]" another until she is "unable to breathe" and "thr[owing] her to the ground," causing her to "hit her head on the concrete." 852 F.3d at 418. The panel's approach would allow that claim to proceed. Yet the Fifth Circuit held the opposite because the victim's activity at the time of injury—participating in a military-training function—was incident to service. *Id.* at 421.

Consider, too, *Citizens National Bank of Waukegan v. United States*, 594 F.2d 1154 (7th Cir. 1979). There, while a servicemember was confined for breaking military rules, guards beat him "without provocation," resulting in

14

serious and permanent injuries. *Id.* at 1155. Focusing on the victim's activity—serving military confinement—requires application of *Feres*, as the Seventh Circuit held. *Id.* at 1157-58. Following the panel's approach would mandate the opposite result: an unprovoked assault can hardly be said to serve a military purpose.

## II. The Panel's Decision Highlights the Irreconcilable Condition of the Ninth Circuit's *Feres* Jurisprudence

This Court has acknowledged that its *Feres* jurisprudence is "something of a muddle," and "cases applying the *Feres* doctrine are irreconcilable." *Schoenfeld*, 492 F.3d at 1019. The panel's decision in this case is just the latest example of the disarray in this Court's *Feres* jurisprudence. Reconsideration is necessary to re-establish uniformity of the *Feres* doctrine.

1. The panel's tort-focused approach conflicts with other decisions of this Court. This Court has previously concluded that the applicability of *Feres* does *not* turn on the defendant's tortious conduct. *See Jackson*, 17 F.3d at 284 ("Whether *Feres* immunity exists does not turn on the constitutionality of … a defendant's actions."); *Becker v. Pena*, 1997 WL 90570, at *1 (9th Cir. Feb. 28, 1997) (applying *Feres* bar because "[w]hile the acts of sexual harassment served no military purpose, they were incident to [servicemember] Becker's military service").

15

Yet on another occasion, a panel erroneously focused on the defendant's tortious conduct, as opposed to the plaintiff-servicemember's activity. *See Lutz v. Sec'y of the Air Force*, 944 F.2d 1477, 1488 (9th Cir. 1991) (allowing case to proceed because the "*defendants' actions* were not 'incident to service'" (emphasis added)). The law cannot be both ways.

The dispositive inquiry cannot be whether the plaintiff has alleged improper tortious acts; if it were otherwise, innocent defendants would lose the benefit of the *Feres* doctrine until a civilian jury clears them (at which point the *Feres* question is moot). Instead, the inquiry asks whether the plaintiff has alleged injuries "aris[ing] out of or [that] are in the course of activity incident to service." *Feres*, 340 U.S. at 146. Here, Colonel Spletstoser was (i) a member of the military, (ii) subject to military command, (iii) attending the Forum and staying at the hotel in direct connection with her STRATCOM assignment and at military expense, and (iv) allegedly permitted General Hyten to enter her room believing that he wished to have a work-related discussion. Colonel Spletstoser's claimed injuries plainly arise from her military service.

The panel repeatedly emphasized that Colonel Spletstoser was preparing for bed in a hotel accessible to civilians at the time General Hyten allegedly came to her room. Neither assertion changes the military-related nature of

16

the activity that produced the claimed injury: a meeting between a military colonel and her supervising officer, while on duty during military-sponsored travel, to discuss their military work.

2. The panel's decision underscores the unpredictable application of the *Johnson* factors that this Court uses to guide *Feres* analyses. *See* 704 F.2d at 1436-39. The panel concluded that the first factor—place where the alleged tortious act occurred—weighed against application of *Feres* because the hotel was an "off-base location." Add.31. This overly simplistic analysis ignores Ninth Circuit precedent that "[t]o examine the relationship between on- and off-base events … result[s] in an impermissible intrusion upon military matters." *Stauber v. Cline*, 837 F.2d 395, 400 (9th Cir. 1988); *see also Shearer*, 473 U.S. at 57 ("[T]he situs of the [off-base] murder is not nearly as important as whether the suit requires the civilian court to second-guess military decisions."). General Hyten and Colonel Spletstoser were staying at an off-base hotel as part of their military work; they had traveled to the Forum in their military capacities.

The panel likewise erred in holding that the second factor—the plaintiff's duty status—weighed against application of *Feres*, despite Colonel Spletstoser's acknowledgement that she was on active-duty status at the time

of the alleged assault. Add.33; *Johnson*, 704 F.2d at 1438. The panel high-lighted allegations that Colonel Spletstoser was preparing for bed and that General Hyten was wearing workout clothes. Add.33. Neither allegation, however, undermines Colonel Spletstoser's active-duty status. Defending the United States is not a 9-to-5 job, and Colonel Spletstoser's STRATCOM position required her to discuss work-related matters with General Hyten as they traveled.

In analyzing the third factor—benefits accruing to the plaintiff because of her military status—the panel observed that the hotel "was equally open to members of the military and civilians." Add.36. Once again, though, Colonel Spletstoser was in that hotel as a result of, and as a benefit of, military service; the military, after all, was paying for her hotel room. Appellee Br. 44 (Dkt. 27).

The panel's application of the fourth factor underscores the panel's mis-guided focus-on-the-tort approach. Add.36-39. The panel observed that "[i]t would be a highly unusual circumstance when a sexual assault consisting of the facts alleged … would further any conceivable military purpose." Add.39. To be clear, sexual assault is a heinous act that has no place in the military. The panel, however, erroneously concluded that the *Feres* analysis turns on the culpability of the defendant's alleged conduct—rather than the nature of the

plaintiff's activities. *See, e.g.*, *Stauber*, 837 F.2d at 400 & n.10 (applying *Feres* even though defendants' conduct served no military purpose); *Becker*, 1997 WL 90570, at *1 (same).

## III. The Question Presented Is Exceptionally Important

If allowed to stand, the panel's opinion would seriously undermine fundamental separation-of-powers considerations animating the *Feres* doctrine and risk significant military disruptions. Lawsuits that "intrude in military affairs," "second-guess[ ] military decisions," and "impair[ ] military discipline" would become commonplace under the panel's focus-on-the-tort approach. *Stauber*, 837 F.2d at 398-99 (applying *Feres* where claim could not proceed without "impinging on military authority"). Courts would be required to assume the role of military expert and determine whether alleged torts further a "military purpose and thus [are] incident to military service." Add.39. And a finding that a military supervisor's alleged tort was not incident to service will declare open season on the military: Generals and soldiers overseas can be hauled in for depositions, and federal courts will be required to judge the military discipline system by relitigating its results. The result: a military that is constantly looking over its shoulder, distracted from its mission to protect our Nation.

This case exemplifies the dangers. Colonel Spletstoser seeks a civil jury's reconsideration of a three-month-long military investigation that cleared General Hyten of wrongdoing. Allowing this suit to proceed would invite a court or jury to reject the military's conclusions and "would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." *Shearer*, 473 U.S. at 59. Litigation would require countless hours of time and testimony from military personnel—time and testimony already devoted to the military investigation that should have put an end to these false accusations. *See Citizens*, 594 F.2d at 1157 ("If the present lawsuit were permitted to go to trial numerous witnesses now scattered throughout the military service would have to be called to testify.").

The panel's decision invites plaintiffs to second-guess countless military disciplinary decisions. The *Feres* doctrine forecloses that result.

## CONCLUSION

For the foregoing reasons, the Court should grant the petition.

Respectfully submitted,

/s/ *Lisa S. Blatt*
LISA S. BLATT
AMY MASON SAHARIA
KARI M. LORENTSON
ROHIT ASIRVATHAM
   WILLIAMS & CONNOLLY LLP
   *680 Maine Avenue, SW*
   *Washington, DC 20024*
   *(202) 434-5000*
   *lblatt@wc.com*

*Attorneys for Appellant*
*John E. Hyten*

Dated: October 26, 2022

## CERTIFICATE OF COMPLIANCE

I am an attorney for Appellant John E. Hyten and a member of the bar of this Court. I certify that, pursuant to Ninth Circuit Rule 40-1, the attached petition for rehearing and rehearing en banc was prepared in a format, typeface, and type style that comply with Federal Rule of Appellate Procedure 32(a)(4)-(6) and contains 4182 words.

 /s/ Lisa S. Blatt
LISA S. BLATT

DATED: OCTOBER 26, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2022, I electronically filed the fore-going petition for rehearing and rehearing en banc with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Lisa S. Blatt*
LISA S. BLATT

DATED: OCTOBER 26, 2022

**ADDENDUM**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KATHRYN SPLETSTOSER, as an individual, | No. 20-56180 |
| *Plaintiff-Appellee*, | D.C. No. 2:19-cv-10076-MWF-AGR |
| v. | |
| JOHN E. HYTEN, as an individual; UNITED STATES OF AMERICA, | OPINION |
| *Defendants-Appellants.* | |

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted January 10, 2022
Pasadena, California

Filed August 11, 2022

Before: Johnnie B. Rawlinson and Consuelo M. Callahan,
Circuit Judges, and Frederic Block,[*] District Judge.

Opinion by Judge Rawlinson

---

[*] The Honorable Frederic Block, United States District Judge for the
Eastern District of New York, sitting by designation.

**Add.1**

## SUMMARY[**]

### Federal Tort Claims Act / *Feres* Doctrine

The panel affirmed the district court's decision denying former United States Air Force General John Hyten and the United States Government's motion to dismiss former United States Army Colonel Kathryn Spletstoser's first amended complaint alleging that Hyten sexually assaulted her.

The Federal Tort Claims Act ("FTCA") created a broad waiver of the federal government's sovereign immunity.

The district court concluded that the doctrine established in *Feres v. United States*, 340 U.S. 135, 146 (1950) (holding that "the Government is not liable under the [FTCA] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service"), did not bar plaintiff's claims because the "alleged sexual assault [could] not conceivably serve any military purpose."

The panel applied the factors developed in *Johnson v. United States*, 704 F.2d 1431, 1436-39 (9th Cir. 1983), and held that the *Feres* doctrine did not bar the claims raised by plaintiff at this stage of the proceedings. The panel initially emphasized that this case involved an allegation of sexual assault, and that this case was before the court on a motion to dismiss where the court must assume the truth of the allegations as pled. Sexual assault is a grievous violation of

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

bodily integrity and one of the most egregious intentional torts.

Concerning the first *Johnson* factor—the place where the tortious act occurred—the panel held that the factor weighed against application of the *Feres* doctrine. The alleged sexual assault occurred at a hotel in California. The hotel was equally open to members of the military and non-military, and the military was not responsible in any way for the operations or security of the hotel.

The second *Johnson* factor is the duty status when the tortious act occurred. Plaintiff acknowledged that she was on active-duty status, but emphasized that the incident occurred during her personal time. The incident occurred as plaintiff was preparing for bed in her private hotel room, where she was not expecting any visitors. The panel held that these facts weighed against application of the *Feres* doctrine.

The third *Johnson* factor is the benefits accrued due to status as a service member. Analysis of this factor centers around whether a service member has access to an on-base or government-sponsored activity, event, or service, to the exclusion of the civilian public. Plaintiff did not have access to her hotel room solely because of her status as a military service member—any civilian could have booked the room. Although plaintiff and Hyten were attending a forum on behalf of a government agency, plaintiff was preparing for bed in a private hotel room where the incident occurred. The panel held that these facts weighed strongly against application of the *Feres* doctrine.

The fourth *Johnson* factor is the nature of the activities when the tortious act occurred. The panel held that this

4 SPLETSTOSER V. HYTEN

factor weighed heavily in plaintiff's favor. It is unimaginable that plaintiff would have been "under orders" to submit to Hyten's sexual advances, or that she was performing any sort of military mission in conjunction with the alleged assault. Rather, plaintiff, like the plaintiffs in *Johnson*, stood in exactly the same position as a civilian. The asserted tortious act (sexual assault) did not involve a close military judgment call, did not further any conceivable military purpose, and could not be considered incident to military service.

After considering the *Johnson* factors and other cases analyzing the *Feres* doctrine, the panel agreed with the district court that plaintiff's action was not barred by the *Feres* doctrine at this stage, and therefore the motion to dismiss was properly denied.

**COUNSEL**

Lowell V. Sturgill Jr. (argued) and Mark B. Stern, Appellate Staff; Tracy Wilkison, Acting United States Attorney; Reginald M. Skinner, Senior Trial Attorney; Richard Montague, Senior Trial Counsel; Brian M. Boynton, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Ariel E. Solomon (argued), Solomon Law Firm PLLC, Albany, New York; Majed Dakak and Trevor V. Stockinger, Kesselman Brantly Stockinger LLP, Manhattan Beach, California; for Plaintiff-Appellee.

Don Christensen, Protect Our Defenders, Alexandria, Virginia, for Amici Curiae Protect Our Defenders, Not In My Marine Corps, and Service Women's Action Network.

Brian K. Lewis, Francis White Law PLLC, Woodbury, Minnesota, for Amici Curiae Combat Sexual Assault, Never Alone Advocacy, and Maven Foundation.

## **OPINION**

RAWLINSON, Circuit Judge:

This case requires us to once again consider application of the doctrine established in *Feres v. United States*, 340 U.S. 135 (1950). Plaintiff-Appellee Kathryn Spletstoser (Spletstoser), a former Colonel in the United States Army,[1] brought this action against Defendant-Appellant John Hyten (Hyten), a former General in the United States Air Force,[2] and the United States Government, alleging that Hyten sexually assaulted her.

The Government and Hyten (together, Appellants) seek review of the district court's decision denying Appellants' motion to dismiss Spletstoser's First Amended Complaint (FAC). Specifically, the district court concluded that the

---

[1] Spletstoser has since retired.

[2] Hyten was subsequently elevated to the position of Vice Chairman of the Joint Chiefs of Staff, but has since retired. Connor O'Brien, Senate confirms Biden's Joint Chiefs pick, POLITICO (Dec. 16, 2021), https://www.politico.com/news/2021/12/16/senate-confirms-bidens-joint-chiefs-pick-525239 (last visited April 1, 2022).

*Feres* doctrine does not bar Spletstoser's claims because the "alleged sexual assault [could] not conceivably serve any military purpose." We have jurisdiction under 28 U.S.C. § 1291 and we affirm the district court's holding.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

During the relevant period, Spletstoser was assigned to the United States Strategic Command (STRATCOM) as Director of the Commander's Action Group (CAG). She was chosen for this role based on her record of exemplary leadership, education, and accomplishment. Months after Spletstoser's assignment to STRATCOM, Hyten became the STRATCOM Commander and Spletstoser remained as CAG Director. Notwithstanding her assignment to STRATCOM, Hyten was not Spletstoser's supervisor for disciplinary purposes.

Approximately a year after Hyten took command, STRATCOM was invited to attend the Reagan National Defense Forum (Forum). The Forum is hosted by the Reagan Presidential Library, a civilian organization, and sponsored primarily by the private sector. The military had no input as to invitees. Spletstoser and Hyten were two of the "comparatively low percentage of military officials in attendance."

Spletstoser and Hyten lodged at a hotel that was open to members of the military and to members of the general public during the Forum. The military was in no way responsible for the operations or security of the hotel. On the evening of December 2, 2017, after the Forum concluded, Spletstoser returned to her hotel room, which was directly across the hall from Hyten's room. Hyten unexpectedly knocked on

Spletstoser's door "late in the evening," while she was getting ready for bed. Hyten was wearing workout clothes, and the two did not discuss any military matters. Instead, according to Spletstoser, Hyten "restrained [Spletstoser], grabbed her buttocks, kissed her against her will[,] and rubbed his penis against her until he ejaculated," all while declaring that he "want[ed] to make love to [Spletstoser]."

Based on these allegations, Spletstoser asserted seven state law claims for relief against Hyten in the FAC: (1) sexual battery in violation of Cal. Civ. Code § 1708.5; (2) assault; (3) gender violence in violation of Cal. Civ. Code § 52.4; (4) intentional infliction of emotional distress; (5) battery; (6) violation of the Ralph Act, Cal. Civ. Code § 51.7; and (7) violation of the Tom Banes Civil Rights Act, Cal. Civ. Code § 52.1. Appellants moved to dismiss the FAC, arguing that the suit was barred by the *Feres* doctrine. The district court denied Appellants' motion to dismiss, resulting in this timely appeal. We have jurisdiction under 28 U.S.C. § 1291. *See Lutz v. Secretary of Air Force*, 944 F.2d 1477, 1481–83 (9th Cir. 1991) (explaining that an order denying a motion to dismiss under the *Feres* doctrine is a "reviewable collateral order"). Applying the factors developed in *Johnson v. United States*, 704 F.2d 1431, 1436–39 (9th Cir. 1983), *as amended*, we agree with the district court that the *Feres* doctrine does not bar the claims raised by Spletstoser at this stage of the proceedings.

## II. DISCUSSION

### A. STANDARD OF REVIEW

We treat a motion to dismiss pursuant to the *Feres* doctrine as a motion to dismiss for lack of subject matter

jurisdiction under Federal Rule of Civil Procedure 12(b)(1), taking the allegations in the complaint as true. *See Bowen v. Oistead*, 125 F.3d 800, 803 (9th Cir. 1997); *see also Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004). Whether the *Feres* doctrine applies is a question of law we review de novo. *See Bowen*, 125 F.3d at 803.

## B. FRAMEWORK OF THE *FERES* DOCTRINE

Because application of the *Feres* doctrine is central to our analysis, a discussion of the evolution of that doctrine may prove helpful. We start with the Federal Tort Claims Act (FTCA), which created a broad waiver of the federal government's sovereign immunity: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . ." 28 U.S.C. § 2674.

The precursor to *Feres*, *Brooks v. United States*, 337 U.S. 49 (1949), initially interpreted the FTCA for tort cases involving "members of the United States armed forces." *Id*. at 50. In that case, two brothers who were in the military, together with their non-military father, were riding in their vehicle when it was hit by an Army truck driven by a civilian employee of the Army. *See id*. One brother and the father were injured. *See id*. The other brother was killed. *See id*. The surviving brother, the estate of the deceased brother, and the father brought actions against the United States. *See id*. and n.1. The government moved to dismiss the brothers' actions on the basis that, as members of the armed forces, the brothers were "barred from recovery." *Id*. at 50. The district court denied the motion, but the Fourth Circuit reversed. *See id*.

The Supreme Court granted certiorari because of the "importance [of the case] as an interpretation of the [FTCA]." *Id*. In reversing the Fourth Circuit, the Supreme Court noted that the terms of the FTCA "clear[ly] . . . provide for District Court jurisdiction over any claim founded on negligence brought against the United States." *Id*. at 51. The Court was "not persuaded that 'any claim' means 'any claim but that of servicemen.'" *Id*. The Supreme Court observed that none of the FTCA's twelve exceptions excluded the brothers' claims. *See id*. Finally, the Court clarified that its conclusion rested on the fact that the accident "had nothing to do with the [brothers'] army careers, [and dealt with] injuries not caused by their service except in the sense that all human events depend on what has already transpired." *Id*. at 52. Notably, the Court signaled that if the accident were "incident to the [brothers'] service, a wholly different case would be presented." *Id*. The Court "express[ed] no opinion" as to that different case. *Id*.

The "different case" described in *Brooks* was presented in *Feres*. The *Feres* decision resulted from the United States Supreme Court's consideration of a trilogy of cases: *Feres*, *Jefferson v. United States*, 339 U.S. 910 (1950), and *United States v. Griggs*, 339 U.S. 951 (1950), all involving plaintiffs who were on active duty in the military. *See Feres*, 340 U.S. at 136–38. The Supreme Court decided the three consolidated cases to further clarify the reach of the FTCA, "as to which Courts of Appeals [were] in conflict." *Id*. at 136.

In *Feres*, the executrix of Feres' estate brought an action against the government after Feres perished in a fire that occurred in the barracks. *See id*. at 136–37. The executrix asserted that the government was negligent "in quartering

**Add.9**

[Feres] in barracks known or which should have been known to be unsafe because of a defective heating plant, and in failing to maintain an adequate fire watch." *Id*. at 137. The district court dismissed the negligence action and the Second Circuit affirmed. *See id*. at 136–37.

In *Jefferson*, the plaintiff underwent abdominal surgery "while in the Army." *Id*. at 137. After the plaintiff was discharged, he underwent another surgery, during which a towel bearing the inscription "Medical Department U.S. Army" was discovered in his stomach. *Id*. Jefferson brought an action against the government, asserting that the army surgeon negligently left the towel in Jefferson's stomach. *See id*. Following a trial, the district court concluded that the government could not be held liable and the Fourth Circuit affirmed. *See id*.

*Griggs*, the final case of the trilogy, also involved the death of an active duty soldier due to alleged "negligent and unskillful medical treatment by army surgeons." *Id*. The district court dismissed the complaint, but the Tenth Circuit reversed. *See id*.

The Supreme Court noted that the three cases shared the "common fact" that "each claimant, while on active duty and not on furlough, sustained injury due to negligence of others in the armed forces." *Id*. at 138. The Supreme Court identified the issue as "whether the Tort Claims Act extends its remedy to one sustaining 'incident to the service' what under other circumstances would be an actionable wrong." *Id*. The Court further observed that "the common fact" of the three cases was the "wholly different case reserved from [its] decision in [*Brooks*]." *Id*. Stated differently, the Supreme Court was signaling that the FTCA should not be extended to

an injury that was "incident to" military service. *Id*.; *see also Brooks*, 337 U.S. at 52.

The Court distinguished its earlier decision in *Brooks* on the basis that "[t]he injury to Brooks did not arise out of or in the course of military duty." *Feres*, 340 U.S. at 146. The Court concluded that "the Government is not liable under the [FTCA] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id*. Having reached that conclusion, the Court affirmed the judgments denying liability under the FTCA (*Jefferson* and *Feres*), and reversed the judgment imposing liability under the FTCA (*Griggs*). *See id*.

The Supreme Court's first opportunity to interpret its *Feres* decision with regard to a military claim arose four years later when the Court decided *United States v. Brown*, 348 U.S. 110 (1954). In *Brown*, a service member sustained a knee injury while on active duty, leading to his honorable discharge. *See id*. Brown sought medical treatment at a Veterans Administration Hospital. *See id*. During an operation on Brown's knee, seven years after his discharge, hospital staff allegedly used a defective tourniquet that resulted in serious and permanent nerve damage in Brown's leg. *See id*. at 110–11. The district court dismissed Brown's complaint brought under the FTCA, and the Second Circuit reversed. *See id*. at 111. The Supreme Court granted certiorari "because of doubts as to whether *Brooks* . . . or *Feres* . . . controlled." *Id*. (citations omitted).

Before rendering its decision, the Court summarized and harmonized *Brooks* and *Feres*. The Supreme Court explained that "[t]he *Brooks* case held that servicemen were covered by the [FTCA] where the injury was not incident to or caused by

their military service." *Id*.  The Court next clarified that "[t]he *Feres* decision did not disapprove of the *Brooks* case. It merely distinguished it, holding that the [FTCA] does not cover 'injuries to servicemen where the injuries arise out of or are in the course of activity incident to service.'" *Id*. at 112 (quoting *Feres*, 340 U.S. at 146).  The Court then reasoned that Brown's case was "governed by *Brooks*, [and] not by *Feres*," because Brown's injury "was not incurred while [Brown] was on active duty or subject to military discipline." *Id*.  Instead, the "injury occurred after his discharge, while he enjoyed a civilian status." *Id*.  The Court concluded by declaring that "[w]e adhere . . . to the line drawn in the *Feres* case between injuries that did and injuries that did not arise out of or in the course of military duty. Since the negligent act giving rise to the injury in the present case was not incident to the military service, the Brooks case governs and the judgment [in favor of Brown] must be affirmed." *Id*. at 113.

Over twenty years later, the Supreme Court decided *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666 (1977).  In *Stencel*, a military pilot was injured by the malfunction of the ejection system in his aircraft. *See id*. at 667.  The pilot brought a negligence action against the United States and against Stencel, the manufacturer of the ejection system. *See id*. at 667–68.  Stencel cross-claimed against the United States for indemnity, arguing that any malfunction was due to the government's negligent specifications. *See id*. at 668.  The government moved for summary judgment on the pilot's claim and dismissal of Stencel's cross-claim under the *Feres* doctrine. *See id*. at 668–69.  The district court granted both motions and the Eighth Circuit affirmed. *See id*. at 669.

The Supreme Court granted certiorari to further refine its
*Feres* decision. *See id*. at 667. The Court summarized *Feres*
as holding that "an on-duty serviceman who is injured due
to the negligence of Government officials may not recover
against the United States under the [FTCA]." *Id*. at 669. In
upholding the denial of the pilot's claims, the Supreme Court
concluded that because the pilot was "injured in the course of
military service," his claims were barred by *Feres*. *Id*. at 667,
673. The Court held that Stencel's cross-claim for indemnity
was "unavailable for essentially the same reasons" that the
pilot's action was barred by the *Feres* doctrine. *Id*. at 673.

Eight years later, in *United States v. Shearer*, 473 U.S. 52,
53 (1985), the Court decided a case brought by the mother of
an army private who was killed by a fellow serviceman while
off-duty. The mother alleged that the Army knew that her
son's killer, who had been imprisoned in Germany for
manslaughter, was dangerous and that the Army "negligently
and carelessly failed to exert a reasonably sufficient control
over" him, and "failed to warn other persons that he was at
large." *Id*. at 54. The Supreme Court applied the *Feres*
doctrine and concluded that the alleged tortious conduct by
the government was incident to military service because it
involved a "decision of command." *Id*. at 59. Specifically,
the allegations directly challenged "management of the
military," and "call[ed] into question basic choices about the
discipline, supervision, and control of a serviceman," such as
"whether to overlook a particular incident or episode, whether
to discharge a serviceman, and whether and how to place
restraints on a soldier's off-base conduct." *Id*. at 58 (citation,
footnote reference, and internal quotation marks omitted).
The Court concluded that the attempt to "hale Army officials
into court to account for their supervision and discipline of
[members of the military] must fail." *Id*. at 59.

Two years after the *Shearer* decision, the Court decided *United States v. Johnson*, 481 U.S. 681 (1987). In that case, the widow of a deceased Coast Guard helicopter pilot brought a wrongful death action against the United States under the FTCA, asserting negligence on the part of civilian federal employees serving as air traffic controllers. *See id*. at 683–84. The helicopter pilot died while "performing a rescue mission on the high seas." *Id*. at 691. The Supreme Court held that this activity (flying a helicopter during a rescue mission) was incident to the pilot's military service because the pilot "was killed while performing . . . a primary duty of the Coast Guard." *Id*. The Supreme Court noted that there was "no dispute that [the pilot's] injury arose directly out of the rescue mission, or that the mission was an activity incident to his military service." *Id*. The Court concluded that these circumstances fell "within the heart of the *Feres* doctrine as it has consistently been articulated." *Id*. at 692. The Court "reaffirm[ed] the holding of *Feres* that the Government is not liable under the [FTCA] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id*. (citation and internal quotation marks omitted).

In *United States v. Stanley*, 483 U.S. 669 (1987), the Supreme Court's most recent *Feres* case, the Court clarified that, in accordance with the language from *Feres* itself, the "incident to service" test is the appropriate test to determine whether the *Feres* doctrine applies, *id*. at 681, as opposed to a test centered around the extent to which a suit may call into question military decisionmaking. *See id*. at 682–83. The Court described the "incident to service" test favorably as "provid[ing] a line that is relatively clear and that can be discerned with less extensive inquiry into military matters." *Id*. at 683.

## C. NINTH CIRCUIT APPLICATION OF THE *FERES* DOCTRINE

Our first occasion to apply the *Feres* doctrine to a personal injury military claim arose in the case of *Van Sickel v. United States*, 285 F.2d 87 (9th Cir. 1960). An active-duty sergeant in the United States Marine Corps was admitted to a naval hospital for surgery. *See id*. at 88. The sergeant died as a result of the alleged negligence of the hospital's medical personnel, and his widow and minor children brought suit against the government under the FTCA. *See id*. Following "careful review of the broad language of the Supreme Court in *Feres*," we held that the *Feres* doctrine barred the family's wrongful death action because the sergeant "was on active duty and not on furlough and the death was due to the negligence of others in the armed forces," thus constituting an "in-service injury." *Id*. at 91.

We decided our second case applying the *Feres* doctrine to a personal injury military claim one year later in *Callaway v. Garber*, 289 F.2d 171 (9th Cir. 1961). Three Air Force sergeants, including Sergeant Callaway, were traveling on a highway in Montana from an Air Force base in South Dakota to attend a special training program at the Boeing Aircraft Plant in Seattle for six weeks. *See id*. During the drive, a recruiting officer in the United States Navy negligently drove his car into the sergeants' vehicle, resulting in a collision that ultimately killed Sergeant Callaway. *See id*. Sergeant Callaway's wife and the administrator of his estate brought separate actions against the United States under the FTCA. *See id*. at 172. After discussing the trilogy of cases resolved in *Feres*, *see id*., we concluded that the sergeant's "travel at the time of the injury" was "incident to service" because: (1) "[w]ithout travel he could not respond to the orders of his

superior"; (2) the "objective of the orders was to provide training"; (3) the "place where that training was to be provided was at a distance from his base"; (4) the "travel was as much a part of his duty as the training itself"; and (5) the "person responsible for the injury was another serviceman following out and in the course of his duties." *Id*. at 173 (citation omitted). Under the "incident to service" test adopted by the Supreme Court, we determined that the case fell "within the rule of the *Feres* case as promulgated," thereby barring recovery. *Id*. at 174.

In the decades following *Van Sickel* and *Callaway*, we have decided a number of cases involving the *Feres* doctrine. In *Johnson*, 704 F.2d at 1436, we endeavored to provide a coherent framework for applying the *Feres* doctrine.

The facts in *Johnson* originated from an FTCA action against the government for injuries suffered in an automobile accident following an after-hours party at an on-base club for non-commissioned officers (NCOs), where a member of the Air Force worked a second job as a bartender during off-duty hours. *See id*. at 1433. We concluded that his claim was not barred by *Feres* because the alleged negligent act of permitting the NCO Club to remain open past 2:00 a.m. "in violation of both Montana law and Air Force regulations" was not incident to military service. *See id.* at 1433, 1436–37. We reasoned that "[a]lthough the negligent act in this case . . . occurred on-base, the connection between the situs of the negligence and Johnson's military service is so tenuous that location is not an important factor." *Id*. at 1437 (citation omitted). We distinguished "between those cases involving activities arising from life on the military reservation, and those in which presence on the base has little

to do with the soldier's military service." *Id*. (citations omitted).

We explained that, while Johnson was "undeniably an active member of the Air Force at the time of the accident and thus on active duty status," the "important question is whether [Johnson] was engaging in an activity that is related in some relevant way to his military duties." *Id*. at 1438. We ultimately concluded that at the time of his injury, Johnson "was in the same position that any civilian employee of the NCO Club might have been in at the time of the government's negligence." *Id*. Indeed, Johnson "could just as easily have been injured had he never worn a uniform at all." *Id*. at 1439 (citation, alteration, and internal quotation marks omitted).

We gave three reasons why the *Feres* doctrine did not bar Johnson's claims against the government:

> First, at the time the government's negligence occurred, Johnson was not subject in any real way to the compulsion of military orders or performing any sort of military mission. . . . Johnson [stood] in exactly the same position as a civilian employee of a privately owned nightclub.

> Second, at the time of the government's negligence, Johnson was subject to military discipline only in the very remotest sense. Because Johnson was off-duty and working at a non-military second job, his activities were purely personal.

**Add.17**

> Third, Johnson's activities [did] not involve the sort of close military judgment calls that the *Feres* doctrine was designed to insulate from judicial review. [This was not] a case where the government's negligence occurred because of a decision requiring military expertise or judgment. Rather, the government [was] negligent precisely because it failed to follow established military rules and procedures governing the operation of its NCO Club. A civilian patron . . . could certainly recover [and] Johnson too should be allowed to recover.

*Id*. at 1439–40 (citations, alteration, footnote references, and internal quotation marks omitted).

To explain our resolution of the case, we "isolate[d] four factors that most courts have considered important" in "interpreting *Feres*," and reiterated that our ultimate task is to "determine whether an injury occurred 'in the course of activity incident to service.'" *Id*. at 1436 (quoting *Feres*, 340 U.S. at 146). We recognized that "[t]he only way to decide whether an injury is incident to service is to consider the facts of each individual case," and consider the "totality of the circumstances" in applying the four factors. *Id*. at 1436–37 (citations omitted). This approach is consistent with the Supreme Court's statement in *Shearer* that the "*Feres* doctrine cannot be reduced to a few bright-line rules." 473 U.S. at 57. Instead, "each case must be examined in light of the [FTCA] as it has been construed in *Feres* and subsequent cases." *Id*.

Following the *Johnson* decision, we have continued to apply the four non-exclusive factors articulated in *Johnson* to determine whether a tortious activity is "incident to military service" such that an action against the government or a fellow service member should be barred by the *Feres* doctrine:

> 1) the place where the tortious act occurred;

> 2) the duty status of the plaintiff when the tortious act occurred;

> 3) the benefits accruing to the plaintiff because of his or her status as a service member; and

> 4) the nature of the plaintiff's activities at the time the tortious act occurred.

*See Johnson*, 704 F.2d at 1436–39.

*Bon v. United States*, 802 F.2d 1092, 1093 (9th Cir. 1986), involved an active-duty member of the United States Navy, Janice Bon (Bon), who had rented a canoe from the Special Services Center at the Naval Training Center. *See id*. Bon was injured "on or near a Navy Special Services facility," when another service member, who had rented a motorboat from the Special Services Center, struck her canoe. *Id*. Both Bon and the operator of the motorboat were on authorized leave and "not engaged in official duties." *Id*. The Naval Special Services Center is operated by the Naval Training Center and is under the direct responsibility of the commanding officer of the Naval Training Center. *See id*. The Services Center "provide[s] . . . off-duty leisure and

recreation activities" to "Navy personnel and their dependents," and Naval "rules and regulations govern the rental and operation of boats at the Naval Training Center." *Id*. At all relevant times, both Bon and the motorboat operator were subject to discipline for violations of the governing rules and regulations. *See id*.

Applying the *Johnson* factors, we first determined that "the accident occurred on or near the Special Services Center," thus supporting *Feres* immunity under the location factor. *Id*. at 1095 (footnote reference omitted). We next noted for the duty status factor that although Bon and the driver of the motorboat were not "engaged in an official duty," both were "active duty service members," and "taking part in an activity provided for the benefit of their military service." *Id*.

We then observed that the "final two *Johnson* factors [benefits and nature of the activities] carr[ied] the most weight in this case." *Id*. We explained that Bon "enjoyed the use of the Special Services Center solely by virtue of her status as a member of the military," and thus Bon "did not occupy a status similar to that of any civilian." *Id*. For the final factor, we determined that "Bon was subject to military orders and regulations for the particular activity in which she was engaged." *Id*. at 1096. This indication of "direct military control" sufficed to characterize the accident as "incident to military service." *Id*. We thus affirmed the district court's determination that the *Feres* doctrine barred Bon's action. *See id*.

In *Dreier v. United States*, 106 F.3d 844, 845–46 (9th Cir. 1996), *as amended*, the widow of a soldier brought a wrongful death action under the FTCA after her husband fell

into an on-base wastewater drainage channel following an off-duty afternoon at a small on-base beach and boating area "officially limited to members of the military community and civilians who acquire use permits." Nevertheless, "the public [was] often able to gain access" even without a permit. *Id*. at 846.

We determined that the first *Johnson* factor (location) "weigh[ed] in favor of a *Feres* bar," because it was "undisputed that [the soldier] was on [the military base] when he was killed." *Id*. at 852. For the second *Johnson* factor, duty status, we reasoned that, just as in *Johnson*, the soldier "was in the same position" as any civilian "participating in the same leisure activities." *Id*. at 853 (citation omitted). Addressing the third *Johnson* factor (benefits), we determined that, like the bartending job in *Johnson*, the soldier's ability to use the recreational area "can hardly be characterized as a privilege or benefit incident to his military service." *Id*. (citation omitted). We noted that the recreational area "was generally open to the public, at least with an easily-acquired pass," and there was "no evidence that [the soldier] and his three companions were present . . . *because* of their military status." *Id*. (emphasis in the original).

We concluded that the fourth *Johnson* factor (nature of the activity) weighed against *Feres* immunity because, "like the plaintiff in *Johnson*," the soldier "was not subject in any real way to the compulsion of military orders or performing any sort of military mission," and "was subject to military discipline only in the very remotest sense." *Id*. (citation omitted). We contrasted this reasoning with the plaintiff in *Bon*, who was "subject to military orders and regulations for the *particular activity in which she was engaged*." *Id*. (citation and alteration omitted) (emphasis in the original).

For those reasons, we did not view the government's negligence regarding the on-base wastewater drainage channel as involving "the sort of close military judgment call that the *Feres* doctrine was designed to insulate from judicial review," noting that the plaintiff made "no allegations of inadequate military supervision or training, but rather allege[d] the same type of negligence that could be alleged against a completely private water treatment plant." *Id*. at 853–54 (citations and footnote reference omitted). After applying the *Johnson* factors, we held that the soldier's "injuries were not suffered incident to service," and the case was not barred by the *Feres* doctrine. *Id*. at 855 (internal quotation marks omitted).

In *Costo v. United States*, 248 F.3d 863, 864 (9th Cir. 2001), two sailors in the Navy drowned while "participat[ing] in a Navy-led recreational rafting trip." The estates of both sailors sued the United States for negligence under the FTCA. *See id*. at 865. The rafting program "was operated within the command structure of the military." *Id*. at 864. The Navy sponsored the rafting program to benefit "naval personnel and their family members." *Id*. at 865 (citation omitted). In applying the *Johnson* factors, we noted that the *Feres* analysis "beg[an]—and, in large measure, end[ed]—with *Bon* . . . a closely analogous case." *Id*. at 867 (citation omitted). We explained that, as in *Bon*, the two sailors "were on active duty but on liberty at the time of the accident," the rafting trip "was provided as a benefit of military service," and the program "was under the command of the base's commanding officer." *Id*. We noted that although the accident itself occurred off-base, the "appropriate consideration is the 'situs of the negligence.'" *Id*. at 868 (citation omitted). We thus affirmed the district court's holding that the estates' action was barred by *Feres*. *See id*. at 869.

In *McConnell v. United States*, 478 F.3d 1092, 1093 (9th Cir. 2007), a lieutenant in the Air Force died in a boating accident. The day before the accident, a fellow lieutenant rented a boat from the Air Force base's Recreation Center because the deceased and two other lieutenants "were busy in a meeting." *Id*. The deceased and the two other lieutenants "were subsequently briefed on the installation rules and regulations governing the use of the boat, and were required to follow them." *Id*. After the group transported the boat off-base to a nearby lake, the deceased was waterskiing behind the boat and, at some point, fell. *See id*. at 1093–94. The other lieutenants "steered the boat back around to bring the ski rope to [the deceased]," but were unable to slow the boat due to a broken cable. *Id*. at 1094. The boat collided with the deceased, who suffered a fatal head injury. *See id*. His parents brought an action under the FTCA for wrongful death and loss of consortium. *See id*.

We noted the similarities of this case to the situations in *Bon* and *Costo*, and applied "the four [*Johnson*] factors to the particular facts in this case." *Id*. at 1096 (citation omitted). We determined that the first factor weighed in favor of *Feres* immunity because the alleged negligence ("fail[ure] to service and repair the boat") occurred at the Air Force base. *Id*. Thus, although the accident occurred off-base on a lake, the "situs of the negligence" took place on-base. *Id*. (citations omitted). The parties agreed that the deceased was on leave, but he "was still subject to military orders and discipline." *Id*. We concluded that because the deceased "was not on duty at the time of the accident," the second factor "may weigh against the application of the *Feres* doctrine." *Id*. We next agreed with the district court that the deceased's "use of the motorboat was a benefit of his position as a [United States Air Force] service-man," under the third *Johnson* factor. *Id*.

Specifically, we determined that because boat rentals could only be provided to "active duty members and their family members," and guests "had to be supervised and accompanied by military personnel," the benefits to the deceased were more similar to the service member in *Bon* than to the service members in *Dreier* and *Johnson*. *Id*. at 1097. In other words, the deceased and his fellow lieutenants "were exercising their privileges as service members rather than as civilian guests." *Id*. Finally, we explained that although the deceased's "activities were purely recreational" on the day of the accident, they were not "unrelated to his military status." *Id*. We noted that "[t]he plaintiffs in both *Bon* and *Costo* were similarly engaged in purely recreational activities," and reiterated the principle stated in *Costo* that "military-sponsored activities fall within the *Feres* doctrine, regardless of whether they are related to military duties." *Id*. (citation omitted). We concluded under the fourth *Johnson* factor that the deceased's engagement "in a military-sponsored recreational activity weigh[ed] in favor of the application of the *Feres* doctrine." *Id*. (footnote reference omitted). After applying the *Johnson* factors, we affirmed the district court's holding that the action was barred by *Feres*. *See id*. at 1098.

In *Schoenfeld v. Quamme*, 492 F.3d 1016, 1017 (9th Cir. 2007), a lance corporal in the United States Marine Corps lost his leg when the vehicle in which he was a passenger "crashed into a previously damaged, but unrepaired, guardrail on a military base." The corporal brought a personal injury action against the United States under the FTCA. *See id*. As with prior cases involving application of the *Feres* doctrine, we "examine[d] the Ninth Circuit cases that [were] most factually analogous," and "structure[d] our analysis around the four *Johnson* factors." *Id*. at 1019–20, 1023 (citation

omitted). We held that because "the alleged negligence occurred on a military base, the first *Johnson* factor weigh[ed] in favor of a *Feres* bar." *Id*. at 1023 (citation omitted). We cautioned, however, that the situs of the negligence was "not determinative," and "where the nature of a plaintiff's activities at the time of injury are only minimally related to his military service, we have declined to give much weight to this factor." *Id*. (citations omitted). Analyzing the second *Johnson* factor, we observed that while the corporal was "an active duty marine," he "was on liberty" for the weekend. *Id*. We articulated that because the corporal "was not engaged in military activity when he was injured . . . his duty status is at best marginally relevant to the *Feres* analysis." *Id*. (citation omitted). We thus concluded that the corporal's "active duty status cuts in favor of applying *Feres* . . . but not strongly given that he was on liberty at the time." *Id*. (citation omitted).

Regarding the third factor, we held that "riding along Stuart Mesa Road, which is partially open to the public, was not a privilege available to [the corporal] because of his military status." *Id*. at 1024. Rather, the corporal "was doing what any member of the public could have done that Saturday morning." *Id*. We analogized the corporal's position to the service members in *Johnson* and *Dreier*, who were in the same position as "any civilian," and distinguished the corporal from the plaintiff in *Bon*, because the plaintiff in *Bon* "was able to rent a canoe only because of her military status," and because "no member of the public could have participated in the . . . activities." *Id*. at 1024–25 (citations omitted).

Addressing the fourth factor, we concluded that the nature of the corporal's activities were not incident to his military

service because he was not "subject to the compulsion of military orders or performing any sort of military mission." *Id*. at 1025 (citation and internal quotation marks omitted). The military did not require the corporal to drive to his intended destination that day, and his "activities leading up to his accident [were] not meaningfully distinguishable from those of a civilian." *Id*. Importantly, the government's negligent failure to repair the road would not "involve the sort of close military judgment call that the *Feres* doctrine was designed to insulate from judicial review," and "the neglected damage to the guardrail in this case could just as easily have existed on a non-military road." *Id*. at 1026 (citations omitted). After utilizing this "totality of the circumstances" approach, we held that the corporal's claim was not barred by the *Feres* doctrine. *Id*. at 1023, 1026; *see also Johnson*, 704 F.2d at 1437 (focusing on "the totality of the circumstances").

Other cases within our Circuit that have not explicitly applied the *Johnson* factors are also consistent with our analysis in *Johnson*.

For example, in *Stauber v. Cline*, 837 F.2d 395, 396 (9th Cir. 1988), the plaintiff, a mechanic for the National Guard, endured a five-year period of harassment from fellow National Guard mechanics. The harassment was primarily on-base, and included such actions as disorganizing the plaintiff's work area and jamming the plaintiff's toolbox closed. *See id*. at 396 n.2. The harassment also included some off-base components, such as driving back and forth in front of the plaintiff's home. *See id*.

Plaintiff brought a tort action against his co-workers that was removed to federal court. *See id*. at 396–97. After a jury

verdict in favor of the plaintiff, the defendants brought a post-trial motion asserting the *Feres* bar. *See id*. at 397. In resolving the *Feres* issue, we characterized "the National Guard mechanic-technicians' work" as "just as integral to routine military activities as was the work of the air traffic controllers . . . in *Johnson*." *Id*. at 400. We mentioned that the plaintiff and defendants were "under the direct command of active-duty military officers." *Id*. The conduct of the parties "was subject to military discipline," and the plaintiff had previously requested "that his superiors step in to improve the situation." *Id*. We reasoned that "the off-base, after-hours harassment was merely an extension of on-base events to which intramilitary immunity properly applies." *Id*. We ultimately concluded that the plaintiff's claims were of the type that "would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness," and could not proceed. *Id*. (citation omitted).

In *Lutz*, 944 F.2d at 1478–79, the plaintiff, a former Air Force Major, sued three subordinates for entering her office after hours, removing from her desk a sealed letter and notes implying that the plaintiff was involved in a relationship with her female secretary, and showing those notes to various squadron personnel. Plaintiff alleged that those actions were taken to harm or ruin her reputation and career. *See id* at 1479. We determined that the alleged injury was not "incident to [military] service" because the "three subordinates had a personal vendetta against a superior," "broke into her office after hours, opened her private mail, and disseminated it in an attempt to ruin her reputation." *Id*. at 1484. We commented that "we, like the district court, cannot fathom how [defendants' actions] can be construed to be activities incident to service." *Id*. at 1486 (internal quotation marks omitted). Although we did not specifically

28                    SPLETSTOSER V. HYTEN

reference every *Johnson* factor, we incorporated several of
them into our analysis. Specifically, we recounted that the
alleged tortious conduct occurred on base and cited to
*Johnson*'s analysis that "[t]he fact that the activity took place
on base is not itself controlling." *Id*. at 1486 n.11 (citation
omitted). We also noted that the plaintiff's "active-duty
status . . . is insufficient, standing alone, to invoke *Feres*." *Id*.
at 1485–86 (citation omitted). We distinguished "enjoyment
of benefits" cases, such as *Bon*, where a plaintiff "availed
herself of facilities or services provided only to members of
the military." *Id*. at 1486 n.11 (citations omitted). We
explained that even if the plaintiff's "use of her office and the
desk in her office arguably amounted to availing herself of a
'benefit' of military service, her injury did not arise directly
out of her use of the desk. Moreover, the intentional nature
of the defendants' actions place[d] them beyond the scope of
the 'enjoyment of benefits' cases." *Id*.

We also distinguished our holding in *Stauber*, explaining
that when the tortious actions were "completely separate from
on-the-job activities, the rationale of *Stauber* does not apply."
944 F.2d at 1487. Thus, we concluded that a personal
vendetta against a superior officer for her sexual orientation
was "completely separate from on-the-job activities," did not
further a military purpose, and was not protected by the *Feres*
doctrine. *Id*.

In *Green v. Hall*, 8 F.3d 695, 697 (9th Cir. 1993), an
Army reservist brought an action against the estate of a fellow
reservist for injuries sustained in an automobile accident that
occurred off-base in the deceased reservist's vehicle. The
two had been attending a military weekend training program
and were going to breakfast off-base just prior to morning
formation. *See id*. We held that the plaintiff "was not injured

incident to service within the meaning of the *Feres* doctrine. [Plaintiff] was injured while off base and before he was due at morning formation." *Id*. at 700 (internal quotation marks omitted). We reasoned that the plaintiff's trip was a "distinctly nonmilitary act." *Id*. (citation omitted). The trip was not made under orders, "was not intended to benefit the military, and did not occur on military property." *Id*. We concluded that the plaintiff's "injuries were therefore related to his military status only in the sense that all human events depend upon what has already transpired, which is insufficient." *Id*. (quoting *Brooks*, 337 U.S. at 52) (internal quotation marks omitted).

In *Jackson v. Brigle*, 17 F.3d 280, 281–82 (9th Cir. 1994), a former Lieutenant Colonel in the Air Force sued the United States and agents of the Air Force Office of Special Investigations (AFOSI), who were investigating the plaintiff's civilian housemate. During the investigation, agents uncovered information about the plaintiff's sexual orientation that was used to discharge him from the Air Force. *See id* at 282. We concluded, and Plaintiff "concede[d] as much in his complaint," that "the agents were acting under color of their authority as military law enforcement officers." *Id*. at 284. We also noted that "the agents were acting under color of General Barry's order" to assist with the investigation, and reasoned that the "fact that the agents' actions were in response to a military officer's order sets this case apart from *Lutz*," which involved military members breaking into an office "apparently on their own volition." *Id*. (citations omitted). Not surprisingly, we concluded that this investigatory work of military law enforcement officers was "clearly incident to military service." *Id*. (internal quotation marks omitted).

Finally, in *Bowen*, 125 F.3d at 803, when a major in the National Guard was terminated from his tour of duty, we had "no trouble concluding that the personnel decisions contested by [the plaintiff] in fact were made incident to service," and noted the Supreme Court's holding that the decision to discharge a serviceman is a military decision. *Id*. at 805 (quoting *Shearer*, 473 U.S. at 59) (internal quotation marks omitted).

### D. APPLICATION OF THE *JOHNSON* FACTORS TO THE FACTS OF THIS CASE

Before applying the *Johnson* factors, we reiterate our view that a "comparison of fact patterns to outcomes in cases that have applied the *Feres* doctrine is the most appropriate way to resolve *Feres* doctrine cases." *Dreier*, 106 F.3d at 848 (citation and internal quotation marks omitted). At the same time, we emphasize that this case involves an allegation of sexual assault, and that this case is before us on a motion to dismiss where we must assume the truth of the allegations as pled. *See Wolfe*, 392 F.3d at 362.

Sexual assault is a grievous violation of bodily integrity and one of the most egregious intentional torts. *See Coker v. Georgia*, 433 U.S. 584, 597–98 (1977) (describing sexual assault as a "violent crime" that is "highly reprehensible," violates the "personal integrity and autonomy of the [] victim," disregards the victim's "privilege of choosing those with whom intimate relationships are to be established," and, "[s]hort of homicide, is the ultimate violation of self") (citations, footnote reference, and internal quotation marks omitted); *see also Kaur v. Wilkinson*, 986 F.3d 1216, 1222 (9th Cir. 2021) (observing that "[r]ape and sexual violence

. . . are often an atrocious form of physical violence," and "[a]ttempted rape itself is a severe violation of bodily integrity and autonomy") (citations and internal quotation marks omitted); National Prison Rape Elimination Commission Report (June 2009),**[3]** (p. 25 finding that "[s]exual abuse is among the most destructive of crimes," and referring to sexual abuse as "a violent crime with life-changing consequences"). This underlying fact will, as it should, weigh heavily in our analysis of the *Johnson* factors.

### 1. First *Johnson* Factor—Place Where the Tortious Act Occurred

The alleged sexual assault in this case occurred at a hotel in California. At the time of the tortious act, the hotel was equally open to members of the military and non-military, and the military was not responsible in any way for the operations or security of the hotel. The off-base location weighs against application of the *Feres* doctrine. *See Green*, 8 F.3d at 700 (concluding that the plaintiff "was not injured incident to [military] service" when the plaintiff "was injured while off base and before he was due at morning formation") (internal quotation marks omitted).

### 2. Second *Johnson* Factor—Duty Status When the Tortious Act Occurred

In *Johnson*, we held that the "duty status" factor is "not dispositive," and that this factor "cannot be mechanically applied." 704 F.2d at 1437–38. Rather, "[t]he important

---

**[3]** The report prepared by the National Prison Rape Elimination Commission, chaired by the Honorable Reggie B. Walton, is available at https://www.ojp.gov/pdffiles1/226680.pdf (last visited July 7, 2022).

question is whether the service member on active duty status was engaging in an activity that is related in some relevant way to his military duties." *Id*. at 1438. We explained in *Johnson* that, while the plaintiff was "undeniably an active member of the Air Force at the time of the accident and thus on active duty status," that status "[i]n and of itself . . . is not relevant to our inquiry." *Id*. We determined that the plaintiff "was in the same position that any civilian employee" at the club would have been in at the time of the government's negligence, and that circumstance was "sufficient to eliminate any relevant links between his activities and his military service." *Id*. (footnote reference omitted). *See also Lutz*, 944 F.2d at 1485–86 ("While the absence of active-duty status . . . may defeat the application of *Feres*, [its] presence is insufficient, standing alone, to invoke *Feres*.") (citation omitted).

In *Dreier*, we followed the analysis in *Johnson* and held that the soldier's "presence at the [recreation] area was indistinguishable from that of a civilian," and that he "was in the same position as any civilian would have been at the time of the government's negligence." 106 F.3d at 853. We thus determined that even if this factor "weighs slightly in favor of a *Feres* bar," it was "not determinative." *Id*.

In *Schoenfeld*, 492 F.3d at 1023, we noted that while the plaintiff was an active duty marine, he was on liberty at the time of the incident. Thus, the plaintiff's active duty status "cut[] in favor of applying *Feres*, but not strongly given that he was on liberty at the time." *Id*. (citation omitted). We concluded that "because [the plaintiff] was not engaged in military activity when he was injured, . . . his duty status [was] at best marginally relevant to the *Feres* analysis." *Id*. (citation omitted); *see also Green*, 8 F.3d at 697 (concluding

that although plaintiff, an Army reservist, was participating in a weekend-long training session, had participated in a parachute jump until 3:00 a.m. on Saturday morning and had to report to formation at 9:00 a.m. that same morning, the *Feres* doctrine did not bar liability for plaintiff's injury sustained off-base fifteen minutes before formation).

Spletstoser acknowledges that she was on active-duty status, but emphasizes that the incident occurred during her personal time. Indeed, the incident occurred as Spletstoser was preparing for bed in her private hotel room, where she was not expecting any visitors. Although Hyten came to Spletstoser's hotel room "under the pretense of work-related purposes," the two did not discuss any military matters. Further, Hyten arrived at the door to Spletstoser's hotel room, not in uniform, but wearing workout clothes. Spletstoser, preparing for bed in her private hotel room, "was in the same position as any civilian would have been at the time." *Dreier*, 106 F.3d at 853; *see also Johnson*, 704 F.2d at 1438. These facts weigh against application of the *Feres* doctrine. *See Johnson*, 704 F.2d at 1438.

### 3. Third *Johnson* Factor—Benefits Accruing Due to Status as a Service Member

Analysis of this factor centers around whether a service member has access to an on-base or government-sponsored activity, event, or service, to the exclusion of the civilian public. *See Johnson*, 704 F.2d at 1438–39 (collecting cases); *see also Dreier*, 106 F.3d at 853.

In *Johnson*, we recognized that "[s]everal courts have held that the *Feres* doctrine bars suits by service members injured while engaging in on-base or government-sponsored

recreational activities." 704 F.2d at 1438 (citations omitted). We explained that the "one factor that best explains the results in these cases is that the plaintiffs had access to the various recreational and medical benefits only because of their status as military personnel." *Id*. But unlike those cases, Johnson held a job that is "identified with those routinely performed by civilian[s]," that could not "logically be distinguished from second jobs held by other off-duty military personnel," or "characterized as a privilege or benefit incident to his military service." *Id*. at 1439.

In *Bon*, we noted that "[u]nlike *Johnson* . . . Bon enjoyed the use of the Special Services Center solely by virtue of her status as a member of the military," and "did not occupy a status similar to that of any civilian with respect to her presence on and use of the Special Service Center's facilities." 802 F.2d at 1095 (citation omitted). Thus, we concluded that the "benefits accruing to plaintiff because of her status as a member of the military . . . clearly indicate that the activity was incident to military service." *Id*.

In *Dreier*, we distinguished *Bon* because in *Bon*, "the Special Services Center was limited to military personnel and their guests and dependents," but the recreational area in *Dreier* "was generally open to the public, at least with an easily-acquired pass." 106 F.3d at 853 (citation omitted). We analogized the soldier's situation in *Dreier* to *Johnson*, and determined that like "the bartending job of the plaintiff in *Johnson*, [the soldier's] ability [in *Dreier*] to use the [recreational] area 'can hardly be characterized as a privilege or benefit incident to his military service.'" *Id*. (citing *Johnson*, 704 F.2d at 1439).

In *Costo*, we determined that the closely-analogous case of *Bon* was controlling and reasoned that, "[l]ike the canoe rental in *Bon*, the rafting trip [in *Costo*] was provided as a benefit of military service." 248 F.3d at 867. We reiterated that "military-sponsored recreational programs" fall within the *Feres* doctrine. *Id*. at 869.

In *McConnell*, we first noted that boat rentals at the Air Force base's Recreation Center were only available to "active duty members and their family members," and "guests had to be supervised and accompanied by military personnel," making these facts "more like the situation in *Bon* than in *Dreier*." 478 F.3d at 1097. We noted that the deceased's activities in *McConnell* "were purely recreational," as were the activities of the plaintiffs in *Bon* and *Costo*. *Id*. These common facts "weigh[ed] in favor of the application of the *Feres* doctrine." *Id*. (footnote reference omitted).

In *Schoenfeld*, we characterized this third *Johnson* factor as "dr[awing] a clear line between cases" involving service members who had access to the tortious activity "only because of their status as military personnel," and "those where civilians might also have access." 492 F.3d at 1020 (citation omitted). We distinguished the facts in *Schoenfeld* from those in *Bon* and *Costo*, explaining that, "[i]n *Bon*, we emphasized that [the plaintiff] was able to rent a canoe only because of her military status." *Id*. at 1024 (citation omitted). Similarly, we noted that, in *Costo*, the rafting trip "was open only to servicemen." *Id*. at 1022 (citation omitted). We determined that the "factual circumstances of [*Schoenfeld*] are closer to *Johnson* and *Dreier*," because the plaintiff in *Schoenfeld* "was doing what any member of the public could have done that Saturday morning: riding in a car on Stuart

Mesa Road," and any benefits of using that road were not incident to military service. *Id*. at 1024–25.**[4]**

As stated, the alleged sexual assault occurred at an off-base hotel. The hotel was equally open to members of the military and civilians. Spletstoser did not have access to her hotel room solely because of her status as a military service member—any civilian could have booked the room. Although Spletstoser and Hyten were attending the Forum on behalf of STRATCOM, Spletstoser was preparing for bed in a private hotel room when the incident occurred. She was not "engaging in on-base or government-sponsored recreational activities." *Johnson*, 704 F.2d at 1438 (citations omitted). These facts weigh strongly against application of the *Feres* doctrine. *See id*.

### 4. Fourth *Johnson* Factor—Nature of the Activities When Tortious Act Occurred

In *Johnson*, we listed three reasons that the nature of the plaintiff's activities weighed against application of the *Feres* doctrine. *See* 704 F.2d at 1439. First, at the time of the tortious act, the plaintiff "was not subject in any real way to the compulsion of military orders or performing any sort of military mission." *Id*. (citations omitted). Rather, the plaintiff stood "in exactly the same position as a civilian employee" and "could just as easily have been injured had he never worn a uniform at all." *Id*. (citation, alteration, and internal quotation marks omitted).

---

**[4]** This analysis mirrors the Supreme Court's reasoning in *Brooks*. *See* 337 U.S. at 52 (observing that the motor vehicle accident "had nothing to do with the [service members'] army careers").

Second, because the plaintiff "was off-duty and working at a non-military second job, his activities were purely personal." *Id*. at 1440 (citations and internal quotation marks omitted).

Third, the plaintiff's activities did "not involve . . . close military judgment calls," and the tortious conduct did not occur "because of a decision requiring military expertise or judgment." *Id*.

These same three reasons weigh even more heavily in Spletstoser's favor because the tortious act at issue in this case is the intentional tort of sexual assault. It is unimaginable that Plaintiff would have been "under orders" to submit to Hyten's sexual advances, or that she was performing any sort of military mission in conjunction with the alleged assault. *Schoenfeld*, 492 F.3d at 1025; *see also Green*, 8 F.3d at 700. Rather, Spletstoser, like the plaintiffs in *Johnson* and *Schoenfeld*, "st[ood] in exactly the same position as a civilian." *Johnson*, 704 F.2d at 1439; *see also Schoenfeld*, 492 F.3d at 1025. And there can be no doubt that if Hyten had engaged in the same conduct with a civilian staying at the hotel, he would have been subject to legal action. *See Johnson*, 704 F.2d at 1440.

Notably, the tortious "activities" here were far more "personal" than those in *Johnson*. 704 F.2d at 1440 (citation omitted). Indeed, "private sexual conduct" and "intimate association" are at the essence of an individual's personal life. *Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *see also Obergefell v. Hodges*, 576 U.S. 644, 646 (2015); *Lutz*, 944 F.2d at 1485 (determining that claims based on "opening [plaintiff's] personal mail" and disseminating that private information was not *Feres*-barred).

38      SPLETSTOSER V. HYTEN

Finally, the asserted tortious act (sexual assault) does not "involve" a "close military judgment call[]."**[5]** *Johnson*, 704 F.2d at 1440. A claim based on sexual assault is a far cry from those calling into question basic choices about the discipline, supervision, and control of military personnel. *See Shearer*, 473 U.S. at 58 (describing "complex, subtle, and professional decisions" that "are essentially professional military judgments"); *see also Bowen*, 125 F.3d at 805 (following *Shearer* in concluding that military "personnel decisions" are incident to military service).

Unlike in *Shearer*, Spletstoser has not asked this Court to determine whether the military "inadequate[ly] supervis[ed]" or failed to train Hyten with regard to sexual harassment and assault. *Dreier*, 106 F.3d at 854 (footnote reference omitted). Neither has Spletstoser asked this Court to: (1) examine the manner in which the Air Force Office of Special Investigation carried out its investigation of her allegations; (2) evaluate the Report of Investigation prepared by the Office of Special Investigation; (3) address the Department of Defense's and Air Force's failure to punish Hyten; or (4) enter a military protective order. Those matters are not before us and we express no view on them. *See Lutz*, 944 F.2d at 1485.

Nevertheless, one would be hard pressed to conclude that a tortious sexual assault is in any way incident to "a decision

---

**[5]** This conclusion easily follows from our prior rulings that the failure of the military to: (1) "follow established military rules and procedures governing the operation of its NCO Club," *Johnson*, 704 F.2d at 1440; (2) oversee the safety of a water treatment plant on its base, *see Dreier*, 106 F.3d at 853; and (3) oversee road repair on its base, do not "involve the sort of close military judgment call[s] that the *Feres* doctrine was designed to insulate from judicial review." *Schoenfeld*, 492 F.3d at 1026 (citation omitted).

requiring military expertise or judgment." *Johnson*, 704 F.2d at 1440. Frankly, it would be a highly unusual circumstance when a sexual assault consisting of the facts alleged by Spletstoser would further any conceivable military purpose, and thus be considered incident to military service. *See, e.g., Lutz*, 944 F.2d at 1485 (concluding that "had the [defendants] physically assaulted [the plaintiff] to get back at her, causing injuries . . . [w]e find it *inconceivable* that *Feres* would be read to preclude a suit against the individual defendants in such a situation") (emphasis added) (footnote reference omitted); *see also id*. at 1487 ("Intentional tortious and unconstitutional acts directed by one servicemember against another which *further no conceivable military purpose* and are not perpetrated during the course of a military activity surely are past the reach of *Feres*. . . .") (emphasis added).

## III.    CONCLUSION

In *Lutz*, we began our *Feres* analysis by stating that "not every action by one member of the armed services against another implicates military decision making, relates to the military mission, or is incident to service." 944 F.2d at 1484. Thus, one might question why we engaged in this painstaking analysis to reach the conclusion that the alleged sexual assault that occurred here was not an activity "incident to service." *Feres*, 340 U.S. at 146. The answer is that, in *Lutz*, we also cautioned against performing a superficial *Feres* analysis. *See Lutz*, 944 F.2d at 1484. In addition, we recognize the expansive nature of the *Feres* doctrine, *see Dreier*, 106 F.3d at 844, and were careful not to truncate its reach without due deliberation. But after our exhaustive examination of Supreme Court and Circuit precedent, we are compelled to hold today that no matter how expansive the *Feres* doctrine

has become, it does not encompass the facts of this alleged sexual assault.

After analyzing the factors set forth in *Johnson* and considering the totality of the circumstances, we are confident in our determination that this act of alleged sexual assault was not incident to military service, and Spletstoser's action is not barred by the *Feres* doctrine.**[6]** We also reiterate that the existence of a sexual assault allegation weighed heavily in the analysis of the *Johnson* factors. Such an egregious intentional tort creates circumstances that are far different from *Feres* cases that have dealt with: (1) military missions, *see Johnson*, 481 U.S. at 692; (2) military-sponsored recreational activities, *see McConnell*, 478 F.3d at 1097; (3) medical malpractice, *see Van Sickel*, 285 F.2d at 88; and (4) the management, supervision, or training of military personnel, *see Shearer*, 473 U.S. at 58; *see also Dreier*, 106 F.3d at 854. Indeed, as we remarked in *Lutz*, we "cannot fathom" how the alleged sexual assault in this case could ever be considered an activity "incident to [military] service." 944 F.2d at 1486. After considering the *Johnson* factors and other cases analyzing the *Feres* doctrine, we agree with the district court that Spletstoser's action is not barred by the *Feres* doctrine at this stage of the proceedings, and therefore

---

**[6]** Although under the facts in this case, the *Johnson* factors support the conclusion that the *Feres* doctrine did not bar this action, we repeat that not every factor need favor the plaintiff to defeat *Feres* immunity. *See, e.g., Schoenfeld*, 492 F.3d at 1023–26 (concluding that the third and fourth factors weighed against application of the *Feres* doctrine); *Johnson*, 704 F.2d at 1437–40 (same).

SPLETSTOSER V. HYTEN 41

the motion to dismiss was properly denied. *See Lutz*, 944 F.2d at 1487.

**AFFIRMED.**